IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL BUNTS, JANET BUNTS, LILLIAN R. BUNTS, MICHAEL L. COPE, CARRIE M. COPE, GRANT SPRINGER, SUSAN SPRINGER, LUKE COPE, LOGAN COPE, SCOTT GATCHEL, MELISSA GATCHEL, VICTOR A. YAROSZ, AMY YAROSZ, VICTOR S. YAROSZ and NICOLAS J. YAROSZ, J.C., by and through his father and next friend, MICHAEL L. COPE, B.C., by and through his mother and next friend, CARRIE M. COPE, and E.C., by and through her father and next friend, LUKE COPE, Individually and On Behalf of Themselves and All Others Similarly Situated,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. <br><br> JUDGE |
| c/o Goldberg Legal Co., LPA <br> 31300 Solon Road, Suite 12 <br> Solon, Ohio 44139, | ) ) ) | **CLASS ACTION COMPLAINT** |
| | ) | (Jury Demand Endorsed Hereon) |
| Plaintiffs, | ) ) | |
| -vs- | ) ) ) | |
| **NORFOLK SOUTHERN RAILWAY CO.** <br> c/o Corporation Service Company, Statutory Agent <br> 3366 Riverside Drive, Suite 103 <br> Upper Arlington, Ohio 43221, | ) ) ) ) ) ) | |
| and | ) ) | |
| **NORFOLK SOUTHERN CORP.** <br> 650 W. Peachtree Street, NW <br> Atlanta, Georgia 30308, | ) ) ) ) | |
| and | ) ) | |

|  | ) |
| --- | --- |
| **JOHN DOE(s) 1-20** ("Names Unknown") | ) |
| [Actual names are unknown and whose | ) |
| names and addresses Plaintiffs could not | ) |
| discover], | ) |
|  | ) |
| and | ) |
|  | ) |
| **ABC CORP(s) 1-20** ("Names Unknown") | ) |
| [Actual names are unknown and whose | ) |
| names and addresses Plaintiffs could not | ) |
| discover]. | ) |
|  | ) |
| Defendants. | ) |

Plaintiffs, Michael Bunts, Janet Bunts, Lillian R. Bunts, Michael L. Cope, Carrie M. Cope, Grant Springer, Susan Springer, Luke Cope, Logan Cope, Scott Gatchel, Melissa Gatchel, Victor A. Yarosz, Amy Yarosz, Victor S. Yarosz, Nicolas J. Yarosz, J.C., by and through his father and next friend, Michael L. Cope, B.C., by and through his mother and next friend, Carrie M. Cope, and E.C., by and through her father and next friend, Luke Cope, on behalf of themselves individually and collectively (collectively the "Representative Plaintiffs"), and on behalf of a putative class of all other persons and entities similarly situated (collectively the "Class Members" or the "Class"), for their Class Action Complaint based on personal knowledge, the investigation of counsel, and their review of public documents and information, against Defendants, Norfolk Southern Corporation ("NSC"), Norfolk Southern Railway Company ("NSR"), John Doe(s) 1-20, and ABC Corporation(s) 1-20, and each of them, jointly and severally, hereby claim, allege, state and complain as follows:

## **THE PARTIES**

1.      The following Representative Plaintiffs are residents of Columbiana County, Ohio who own real property and businesses and reside in the vicinity of the train derailment or were present in or about the vicinity of the derailment site and seek to be representatives of each respective

Class defined below.

2.      Michael Bunts, Janet Bunts and Lillian R. Bunts (collectively the "Bunts Family") are individuals residing at 43 Malibu Drive, East Palestine, Columbiana County, Ohio 44413.  As a result of the train derailment that is the subject of this case, the Bunts Family was forced to evacuate their residence and suffered damages therefrom.

3.      Michael L. Cope, Carrie M. Cope, J.C., and B.C. (collectively the "Michael Cope Family") are individuals residing at 5703 Carbon Hill Road, East Palestine, Columbiana County, Ohio 44413.  J.C. and B.C. are the minor children of Michael L. Cope and Carrie M. Cope.  As a result of the train derailment that is the subject of this case, the Cope Family was forced to evacuate their residence and suffered damages therefrom.

4.      Grant Springer and Susan Springer (collectively the "Springer Family") are individuals residing at 44 Malibu Drive, East Palestine, Columbiana County, Ohio 44413.  As a result of the train derailment that is the subject of this case, the Springer Family was forced to evacuate their residence and suffered damages therefrom.

5.      Luke Cope, Logan Cope, and E.C. (collectively the "Luke Cope Family") are individuals residing at 108 Thomas Street, East Palestine, Columbiana County, Ohio 44413.  E.C. is the minor child of Luke Cope and Logan Cope.  As a result of the train derailment that is the subject of this case, the Luke Cope Family was forced to evacuate their residence and suffered damages therefrom.

6.      Scott Gatchel and Melissa Gatchel (collectively the "Gatchel" Family) are individuals residing at 2135 Rauch Road, East Palestine, Columbiana County, Ohio 44413.  As a result of the train derailment that is the subject of this case, the Gatchel Family was forced to evacuate their resident and suffered damages therefrom.

7.      Victor A. Yarosz, Amy Yarosz, Victor S. Yarosz, and Nicolas J. Yarosz

3

(collectively the "Yarosz Family") are individuals residing at 180 Concord Drive, East Palestine, Columbiana County, Ohio 44413. As a result of the train derailment that is the subject of this case, the Yarosz Family was forced to evacuate their residence and suffered damages therefrom.

8. The Representative Plaintiffs and the Class Members are among the hundreds (perhaps thousands) of persons who were adversely exposed to, among other things, toxic chemicals, fumes, and carcinogens, many of whom were ordered to evacuate from their residences and businesses (or shelter in place) as a result of Defendants' train derailment and resulting chemical spills, explosions, and fires.

9. NSC is a publicly traded corporation organized and existing under the laws of Virginia with a principal place of business in Atlanta, Georgia. NSC owns all of the common stock of and controls NSR.

10. NSR is a Class I railroad organized and existing under the laws of Virginia with a principal place of business in Atlanta, Georgia. NSR is a wholly owned subsidiary of NSC.

11. NSR operates approximately 19,300 route miles in 22 states and the District of Columbia, with 2,402 route miles (12%) located within the Commonwealth of Pennsylvania alone, and serves every major container port in the eastern United States.

12. According to the Federal Railroad Administration ("FRA"), NSR had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 67 accident total – 22 in 2019, 18 in 2020, 15 in 2021 and 13 in 2022.

13. According to the FRA, NSR also had the most derailments of all railroad companies in Pennsylvania. This includes 74 total accidents (89.2% of all derailments in Pennsylvania) from 2019 to 2022 – 23 in 2019, 14 in 2020, 23 in 2021, and 14 in 2022.

14. At all relevant times, NSC and NSR acted individually as well as by and through one another, and by and through their respective officers, directors, executives, employees, contractors,

subcontractors, and/or agents.

15. Defendants, John Doe(s) 1-20, are Defendants whose identities are unknown to Plaintiffs at this time despite Plaintiffs' counsel conducting a reasonable search with due diligence, but when those parties' true identifies are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties. These Defendants include, but are not limited to, engineers, conductors, and conductor trainees, and/or any individuals that, at any time relevant to these proceedings, negligently caused or contributed to the train derailment, and whose negligence and breaches caused or contributed to cause Plaintiffs' damages and injuries. As such, Plaintiffs are using the fictitious designation of Defendants, John Doe(s) 1-20.

16. Defendants, ABC Corporation(s) 1-20, are Defendants whose identities are unknown to Plaintiffs at this time despite Plaintiffs' counsel conducting a reasonable search with due diligence, but when those parties' true identifies are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties. These Defendants include, but are not limited to, sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings manufactured the toxic substances, prepared and loaded the toxic substances for travel, supplied, operated, inspected, repaired or maintained the railway cars, parts, axles, or supplies, and whose negligence and breaches caused or contributed to cause Plaintiffs' damages and injuries. As such, Plaintiffs are using the fictitious designation of Defendants, ABC Corporation(s) 1-20.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this civil action, pursuant to the provisions of 28 U.S.C. § 1332(d)(2), in that this is a class action, as defined in 28 U.S.C. §1332(d)(1)(B), in which the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs. Additionally, this Court has subject-matter jurisdiction, pursuant to the provisions of 28 U.S.C. § 1332(a)(1), because there is complete diversity of citizenship between

the Representative Plaintiffs and Defendants and the amount in controversy exceeds the sum or value of $75,000.00.

18.     This Court has personal jurisdiction over Defendants, and each of them, jointly and severally, because they regularly engage in business within the state of Ohio, were engaged in business within the state of Ohio at the time of the derailment, and the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of Ohio at the time of the derailment.  In addition, each Defendant has and has maintained certain minimum contacts with Ohio.

19.     Moreover, this Court has personal jurisdiction over Defendants, and each of them, jointly and severally, because Plaintiffs' claims arise under Ohio's long-arm jurisdictional statute, R.C. 2307.382(A), out of Defendants' (i) transacting or conducting business in Ohio, and (ii) causing tortious injury by an act or omission in Ohio.

20.     Venue is properly laid within this judicial district, pursuant to the provisions of 28 U.S.C. § 1391(b)(2), because this judicial district is the district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

21.     This is a Class Action Complaint seeking redress for residents, property owners, and businesses located near the scene of a train derailment that occurred on Friday, February 3, 2023, at approximately 9:00 p.m., near the Village of East Palestine, Columbiana County, Ohio ("East Palestine").

22.     The train was operated by Defendants and consisted of three locomotives and 150 train cars, approximately 20 of which were listed as carrying hazardous materials. The train was traveling from Illinois to Pennsylvania, and its route took it through the middle of East Palestine.

23.     The train was back-loaded with 40% of its weight, the heaviest tanker cars, at the rear.  Lighter cars were loaded between the heavy rear tankers and the front engine.

24.     The train was traveling from Madison County, Illinois to Conway, Pennsylvania, which required a downhill route.

25.     At the aforesaid date and time, approximately 50 train cars of the 141 cars of NSR Train 32N derailed at, near or in the vicinity of 1020 East Taggart Street, East Palestine, which location is at the East End of East Palestine and is at the approximate latitude coordinates of 40° 50' 09.6" North, and approximate longitude coordinates of 80° 31' 21.7" West.

26.     The train was already ablaze when, at approximately 8:13 p.m., it passed through Salem, Ohio, approximately 20 miles west of the eventual site of the fiery derailment in East Palestine.

27.     Shortly before the derailment, the crew was alerted by an alarm indicating a mechanical issue with a malfunctioning railcar axle.

28.     The railcar axle failed when a wheel bearing overheated.

29.     The overheating led to a fire, which then led to the derailment.

30.     But prior to the derailment, the emergency brake was applied.

31.     Ten of the derailed cars carried hazardous materials, five of which contained vinyl chloride.

32.     During and after the derailment, the hazardous chemicals, including but not limited to vinyl chloride, ignited, and the resulting fire continued to burn with increasing intensity for several days:









33.     On Friday, February 3, 2023, the fire was large enough to be detected by the

Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity

around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled to a

point just south of Beaver Falls, Pennsylvania.

34.     The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow. The smoke plume was blown to the south and east due to a northwest wind blowing over the fire.  It traveled at least as far as Bridgewater, Pennsylvania at that time.

35.     Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.

36.     On February 4, 2023, "[r]esponding crews discovered contaminated runoff on two surface water streams: Sulphur Run and Leslie Run."[1] It was also noted that the runoff "impacted aquatic life" and officials with the Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

37.     The fire continued to burn until Sunday, February 5, 2023, when first responders and others learned of "a drastic temperature change in a rail car, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile." Area residents were advised to shelter in place, and local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5 for anyone living within a mile of the derailment site:

---

[1] https://response.epa.gov/site/site_profile.aspx?site_id=15933



38.    On Monday, February 6, 2023, a drastic temperature change took place within the railcar that had malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion that could release not only toxic chemicals, but also deadly shrapnel traveling up to one mile.

39.    The evacuation area was expanded based on "new modeling information" in advance of a planned, so-called "controlled release" of hazardous materials in some of the train cars.

40.    At 4:30 p.m. on Monday, February 6, 2023, NSC and/or NSR intentionally blew holes in each of the five derailed rail cars containing vinyl chloride to drain the chemical into a trench where flares would then ignite and burn the vinyl chloride away. This process was referred to as a

11

"controlled release."

41.    The vinyl chloride was then ignited, causing another massive fire and plume of

hazardous and toxic gases and particulates, including hydrogen chloride and phosgene gas:





42.     Hydrogen chloride is one of the main sources of danger from a vinyl chloride fire. Hydrogen chloride is irritating and corrosive to any tissue with which it comes in contact. Further, when hydrogen chloride comes into contact with water (including water vapor in the atmosphere), it forms hydrochloric acid. Hydrochloric acid causes irritation to the eyes, skin, and mucous membranes of humans and animals. Acute inhalation may cause coughing, hoarseness, inflammation, and ulceration of the respiratory tract; chest pain; and pulmonary edema. Contact with skin may produce burns, ulceration, and scarring.

43.     Phosgene was used as a chemical warfare agent during World War I and was banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare.

44.     Upon information and belief, approximately 1 million pounds of vinyl chloride which were in the train cars that derailed and was spilled or dumped onto the ground near the derailment site and set on fire.

45.     The smoke from the "controlled release" was trapped from rising higher into the

atmosphere due to an inversion layer at around 3,000 feet.  In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud.

46.     Fumes, sediment, and a rise in particulate pollution from the derailment, fire, toxic chemical disbursement, and subsequent explosion, have been reported throughout an area encompassing at least 30 miles around the derailment site.

47.     For example, the U.S. Environmental Protection Agency ("EPA") particulate pollution monitor in Youngstown, Ohio, more than 23 miles from the derailment site, showed a greater than 300% increase in the amount of small particles in the air on February 6, 2023.  The concentration of particulate pollution continued to rise thereafter.  As of February 9, 2023, the particulate levels in Youngstown, Ohio were five times higher than they were prior to February 6, 2023.

48.     Upon information and belief, persons in Beaver County, Pennsylvania, and Lawrence County, Pennsylvania, reported experiencing noxious fumes, numbed tongues and lips from the derailment, fire, toxic chemical disbursement and subsequent explosion.

49.     Upon information and belief, contamination and damage to local streams, rivers and other bodies of water including, but not limited to, the Ohio River, occurred from the release of toxic chemicals and/or the water runoff from the derailment and resulting chemical explosion, leading to the death of fish, wildlife, and other local farm or household animals.

50.     Upon information and belief, the derailment, subsequent chemical spill, fire and toxic explosion were caused by the negligence, carelessness, recklessness, and/or intentional acts of Defendants, and each of them, jointly and severally, in the ownership, operation, inspection, maintenance and repair of the subject train, rail cars, and track system, as well as the design and performance of the "controlled release."

51.    On February 8, Governor DeWine and local officials in both Ohio and Pennsylvania lifted the evacuation, and many residents, property owners, and business owners began to return to their homes and businesses in the vicinity of the derailment site.

52.    Nevertheless, area residents continue to experience symptoms consistent with exposure to toxic and hazardous symptoms. Local officials have advised residents only to drink bottled water and those who have water wells to have those wells tested.

53.    According to documents provided by Norfolk Southern to the EPA, the derailed train contained the following hazardous substances: vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, butyl acrylate, and benzene. The train also contained numerous other chemical substances that were in the cars involved in the derailment, causing those chemicals to be spilled and in some instances burned in the ensuing fire.

54.    The Safety Data Sheet ("SDS") for vinyl chloride describes it as an extremely flammable gas that may form an explosive mixture with air and is carcinogenic – meaning it is known or presumed to cause cancer in humans. A 5-minute exposure to airborne concentrations of vinyl chloride at 8,000 ppm can cause dizziness. As airborne levels increase to 20,000 ppm, effects can include drowsiness, loss of coordination, visual and auditory abnormalities, disorientation, nausea, headache, and burning or tingling of the extremities. Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression. Vinyl chloride exposure is also associated with an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

55.    The SDS for ethylene glycol monobutyl ether describes it as a combustible liquid that causes skin irritation and serious eye irritation and is harmful if swallowed or inhaled.

56.    The SDS for ethylhexyl acrylate describes it as a combustible liquid and vapor that

causes respiratory tract, digestive tract, skin, and eye irritation, causes serious eye damage, and may cause allergic skin reactions. It is also harmful to aquatic life.

57.    The SDS for butyl acrylate describes it as a flammable liquid and vapor that causes skin irritation and serious eye irritation, which is harmful if inhaled and may cause an allergic skin reaction.

58.    The SDS for benzene describes it as a highly flammable liquid and vapor that causes skin irritation and serious eye irritation and may cause cancer and genetic defects.

59.    Upon information and belief, the derailment and subsequent chemical spills, explosions, and fires were caused by the negligence of Defendants in the failure to provide adequate staffing, failure to conduct appropriate inspections of Defendants' track and rail cars, failure to adequately service and maintain its equipment, failure to provide adequate warnings, failure to provide appropriate instructions, negligence in the operation of the train, defects in NSR's track system, and/or defects in one or more of the cars. The National Transportation Safety Board ("NTSB") has reported that "[s]urveillance video from a residence showed what appears to be a wheel bearing in the final stage of overheat failure moments before the derailment."[2]

60.    All residents and businesses within a one-mile to two-mile radius of the derailment site were forced to evacuate as a result of the derailment.

61.    Representative Plaintiffs were adversely affected by the derailment in that they were exposed to the toxic substances, toxic fumes, and carcinogens from the resulting chemical spill, suffered mental and physical injuries, were forced to evacuate from their residences and businesses, were prevented from returning to their residences and businesses after the time of the chemical spill, and even after they were able to return to their residences and businesses, the continuing hazardous conditions and contamination of their property caused by the derailment will prevent them from fully

---

[2] https://www.ntsb.gov/investigations/Pages/RRD23MR005.aspx

and completely using and enjoying their property, and will cause damage to property and property values, and may require remediation efforts to address contamination. Business owners in the affected area were unable to operate during the time of the evacuation, are unable or hindered in operating their businesses while remediation efforts are ongoing and will continue to be precluded from or hindered in operating their businesses because of the hazardous conditions and contamination caused by the derailment and may require remediation efforts to address contamination. Property and business values (including goodwill) will also likely be impacted due to contamination and hazardous conditions resulting from the derailment or concerns about contamination and hazardous conditions resulting from the derailment.

## CLASS ACTION ALLEGATIONS

62.     Representative Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated for all direct, proximate and foreseeable losses caused by the February 3, 2023 train derailment, fire and resulting toxic chemical explosion. The Classes are hereby defined as follows:

**Class A**

All persons, firms or entities who resided in, owned or rented property, or who worked or operated businesses within a 30-mile radius of the train derailment that occurred on February 3, 2023 at, near, or in the vicinity of 1020 East Taggart Street, East Palestine, Ohio 44413, at the approximate latitude coordinates of 40° 50' 09.6" North, and approximate longitude coordinates of 80° 31' 21.7" West (the "Class Zone").

**Class B**

All Members of Class A who evacuated the area, who were ordered to shelter in place, or who were unable to return to their homes, businesses or places of employment pursuant to the direction of government officials, Defendants' employees, or safety personnel.

**Class C**

All persons who were present or located within a thirty-mile radius of the train derailment that occurred at, near, or in the vicinity of 1020 East Taggart Street, East Palestine, Ohio 44413, at the approximate latitude coordinates of 40° 50' 09.6" North, and approximate longitude coordinates of 80° 31' 21.7" West, at any time from February 3, 2023 through February 17, 2023, inclusive.

63.     Excluded from each Class are:  (i) Defendants and any of their affiliates, parents or subsidiaries; (ii) all employees of Defendants; (iii) all persons who make a timely election to be excluded from the Class; (iv) government entities; (v) all judicial officers assigned to this case, their immediate families, and court staff; and (vi) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 train derailment and resulting toxic chemical explosion, arise out of a right of subrogation, whether equitable, contractual or otherwise.

64.     Also excluded from each Class are any claims of physical manifestation of personal or bodily injury.

65.     The thirty-mile radius used in the definition of each Class and any subclasses described above is a preliminary designation. As the Representative Plaintiffs and their counsel conduct further investigation and discovery, it may be determined that the affected area extends farther than thirty miles in some directions from the derailment site, and perhaps less than that distance in other directions.  Prevailing winds at the time of the derailment and in the days after during the fire and "controlled release" will affect the boundaries of the geographic area affected, and it remains to be determined how hazardous materials spilled onto the ground migrated in the soil, streams, and groundwater.

66.     Plaintiffs reserve the right to amend or modify the definition of each Class and any subclasses after having had an opportunity to conduct further investigation into the nature of the Class Members' claims and damages and conduct discovery regarding Defendants' conduct and the

18

events that occurred prior to and after the derailment.

### A.      Numerosity and Ascertainability

67.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous and so geographically dispersed that the joinder of all members is impractical.

68.     While the exact number of Class Members is unknown to Plaintiff at this time, it is ascertainable.  The proposed Classes and any subclasses include thousands of residents and businesses who were unlawfully exposed to vinyl chloride and other toxic chemicals or who had property contaminated by unlawful exposure to vinyl chloride and other toxic chemicals and suffered damages.  In the event a Class is certified under Fed. R. Civ. P. 23(b)(3), Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

### B.      Questions of Law or Fact Common to the Class Members Predominate Over Any Questions Affecting Only Individual Members

69.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law and fact common to each Class as a whole that predominate over any questions affecting only individual members.

70.     The common questions include, without limitation, the following:

a)     Whether Defendants were negligent or otherwise culpable with respect to causing the derailment by acts of omission or commission.

b)     Whether Defendants were negligent or otherwise culpable with how they responded to the derailment by acts of omission or commission.

c)     Whether Defendants' transport of highly toxic chemicals was an abnormally dangerous activity for which they are strictly liable.

d)     Whether Defendants' conduct caused toxic and hazardous substances to be disbursed over and onto the geographic area identified in the class definitions.

e)     Whether Defendants' conduct caused evacuation-related short term economic

harm sustained by members of the Putative Class.

    f)    Whether Defendants' conduct caused other short term and immediate losses in the form of damage to or destruction of tangible personal property.

    g)    Whether Defendants' conduct caused long term economic harm sustained by members of the Putative Class, including but not limited to reduced property values, business goodwill, and community viability.

    h)    Whether Defendants' conduct caused a nuisance and the extent of such nuisance.

    i)    Whether Defendants' conduct caused environmental harm to real property owned or leased by members of the Putative Class.

    j)    Whether Defendants' conduct caused members of the Putative Class to be exposed to toxic and hazardous substances with the potential for immediate physical injuries.

    k)    Whether Defendants' conduct caused members of the Putative Class to be exposed to toxic and hazardous substances with the potential for long term physical injuries.

    l)    Whether Defendants breached their duty to warn Plaintiffs and the Class of and to protect Plaintiff and the Class from the long-term health risks and consequences of exposure to high levels of vinyl chloride and other toxic chemicals.

    m)    Whether medical monitoring is an appropriate remedy that should be imposed in order to provide early detection of future injuries to members of the Putative Class.

    n)    Whether Defendants trespassed on real property owned or leased by members of the Putative Class.

    o)    Whether Defendants acted with conscious disregard for the rights and safety of other persons causing substantial harm, rendering it liable for punitive or exemplary damages.

71.    The above common questions predominate over any questions affecting only individual members of each Class and any subclasses.

**C.**    **Typicality**

72.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

73.    Plaintiffs own property, reside in and/or operate a business within the Class Zone

surrounding the train derailment and toxic chemical explosion, and owned property, resided and/or operated a business in the Class Zone at all relevant times.

74.    Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

75.    Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

76.    Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

   **D.    Adequacy**

77.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members.  Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation.

78.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of any Class Members.

79.    Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

   **E.    Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests**

80.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

81.    The quintessential purpose of the class action mechanism is to permit litigation

against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation.

82.     In this case the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable.

83.     Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

84.     By contrast, a class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**F.      Defendants Have Acted or Refused to Act on Grounds Generally Applicable to the Class Such that Final Injunctive Relief or Corresponding Declaratory Relief is Appropriate With Respect to the Class as a Whole.**

85.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act in connection with the East Palestine train derailment in ways generally applicable to each Class and the Class Members such that final injunctive relief or corresponding declaratory relief is appropriate in this case with respect to each Class as a whole.

86.     Plaintiffs seek final injunctive relief and/or corresponding declaratory relief to redress the harms caused by Defendants' actions and/or refusals to act, including without limitation their request that the Court order medical monitoring under the facts and circumstances of this case.

**G.      Superiority**

87.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and the

interpretation of the common language in their insurance policies predominate over any questions affecting only individual Class Members.

88.     Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

89.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member, than would piecemeal litigation.  Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

90.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## SUPPLEMENTAL MEDICAL MONITORING CLASS ALLEGATIONS

91.     As set forth above, Plaintiffs are not asserting claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

92.     Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

93.     As a direct and proximate result of Defendant's wrongful conduct as set forth above, Plaintiffs and the Class Members have been exposed to toxic substances, toxic fumes and carcinogens and thereby suffer, and will continue to suffer a significantly increased risk of serious injury and diseases. This increased risk makes periodic diagnostic medical testing and examinations necessary.

94.     Medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to vinyl chloride and other toxic substances released by the derailment, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and wellbeing of Plaintiffs and the Class Members they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist which make the early detection of exposure to toxic substances, toxic fumes and carcinogens, and early detection of disease, feasible and beneficial.

95.     The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and members of the Class resulting from their exposure to vinyl chloride and other toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendant, that: (a) notifies

individuals who have been exposed to vinyl chloride and other toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of disease and injuries caused by exposure to vinyl chloride and other toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to vinyl chloride and other toxic substances.

96.     Establishment of a Court-supervised medical monitoring regimen can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for, the above-referenced activities, and those needed examination and testing procedures which Class members actually undergo, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

97.     The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, product warnings and education programs are a matter for the Court to decide, after hearing and consultation with medical, warnings, industrial, and other experts, and class adjudication that the right to this relief is appropriate and necessary.

98.     The medical monitoring program should be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees.

99.     The program should involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regiment.

100.     The program should involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals.

101.     During program administration, Defendants should address issues implicated by program administration as they develop.

102.     By reason of the Defendants' conduct, members of the Class have suffered and will

continue to suffer latent, undiagnosed and impending irreparable injury, warranting a preliminary injunction and an expedited trial on the merits under Fed. R. Civ. P. 65, and a permanent decree granting the relief requested herein. Plaintiffs and the Class they seek to represent will suffer irreparable injury unless the Court so acts.

## CLAIMS FOR RELIEF
(On Behalf of All Plaintiffs Against All Defendants Unless Otherwise Indicated)

### First Claim for Relief
### (NEGLIGENCE)

103.   Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Two (102), inclusive, above as if the same were fully rewritten herein.

104.   The derailment, fire, leak of vinyl chloride, and explosion of toxic chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

105.   Upon information and belief, Plaintiffs aver that the derailment, fire, leak of vinyl chloride and explosion of toxic chemicals was caused by the joint negligence, carelessness and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

106.   In addition, and in the alternative, the derailment, fire, leak of vinyl chloride and explosion of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants. Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

107.   Defendants owed Plaintiffs and the Class Members a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio. Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

   a.   Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting

26

hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;

b. Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

c. Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials.

d. Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

e. Prevent over-loading the train with too many railcars or materials;

f. Load the railcars consistent with accepted practice;

g. Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h. Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

i. Hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 3, 2023;

j. Train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

k. Properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

l. Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

m. Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n. Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o.      Adequately warn those in danger of exposure to hazardous chemicals;

p.      Institute proper procedures and training for response to the mechanical malfunction of a rail car;

q.      Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r.      Institute proper procedures to avoid exposing hazardous materials to the environment;

s.      Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t.      Timely implement such an emergency response plan;

u.      Transport and handle hazardous materials in a manner which would not cause Plaintiffs harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

v.      Properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w.      Evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x.      Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.      Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

z.      Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

aa.     Contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons.

108.    However, in violation of federal regulations and industry practice and procedures,

Defendants negligently, carelessly and/or recklessly, breached their duties to Plaintiffs and each

Class by, among other things:

a.   Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;

b.   Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

c.   Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

d.   Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

e.   Failing to prevent over-loading the train with too many railcars or materials;

f.   Failing to load the railcars consistent with accepted practice;

g.   Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.   Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

i.   Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 3, 2023;

j.   Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

k.   Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

l.   Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including but not limited to vinyl chloride;

m.   Failing to properly instruct and adequately train their agents, servants,

employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n.      Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o.      Failing to adequately warn those in danger of exposure to hazardous chemicals;

p.      Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

q.      Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r.      Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

s.      Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t.      Failing to timely implement such an emergency response plan;

u.      Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct.

v.      Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w.      Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x.      Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.      Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

z.      Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

aa.     Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons in order to avoid injury to;

bb.     Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids; and

cc.     Otherwise unreasonably causing injury to Plaintiff in ways further investigation and discovery will reveal.

109.    Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and combustible liquids by railcar.

110.    Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene, and hydrogen chloride.

111.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the controlled release and burn of hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride was likely contaminating property at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

112.    The damages to Plaintiffs and Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

113.    As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Representative Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and

enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

114.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**Second Claim for Relief**
**(NEGLIGENCE *PER SE*)**

115.    Plaintiffs reallege and incorporate by reference the claims, counts, allegations and statements set forth in Paragraphs One (1) through One Hundred Fourteen (114), inclusive, above as if the same were fully rewritten herein.

116.    The Federal Rail Safety Act, 49 U.S.C. § 20101 *et seq.* ("FRSA"), and its accompanying regulations are implemented to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.

117.    The derailment that forms the basis of this lawsuit is currently under investigation by the NTSB.  The Representative Plaintiffs are currently unadvised of the Federal or State safety laws and regulations that Defendants or their agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery.

118.    Defendants' multiple violations of such safety laws and regulations constitute negligence *per se*.

119.    As a direct and proximate results of Defendants' violations of the above-described laws and/or regulations, all members of each Class sustained injury and damage.

120.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the

imposition of punitive damages.

**Third Claim for Relief**
**(STRICT LIABILITY)**

121.     Plaintiffs reallege and incorporate herein by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Twenty (120), inclusive, above as if the same were fully rewritten herein.

122.     Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the RESTATEMENT (SECOND) OF TORTS §§ 519 and 520.

123.     The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultra-hazardous activity under the definition set forth in the RESTATEMENT (SECOND) OF TORTS §§ 519 and 520.

124.     Defendants engaged in an abnormally dangerous and/or ultra-hazardous activity for which common law strict liability applies for transporting hazardous substances, including but not limited to vinyl chloride, through a residential community in a manner the Defendants knew to be dangerous and without taking proper precautions.

125.     Had Defendants not engaged in the abnormally dangerous and/ or ultra-hazardous activity, Plaintiffs would not have had their property contaminated or been exposed to dangerous levels of vinyl chloride or other toxic substances and endured the other damages set forth herein.

126.     As a direct and proximate result of Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

127. Accordingly, Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and each Class, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and each Class as described above.

128. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

### Fourth Claim for Relief
### (MEDICAL MONITORING)

129. Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Twenty-eight (128), inclusive, above as if the same were fully rewritten herein.

130. Plaintiffs, Michael Bunts, Janet Bunts, Lillian R. Bunts, Michael L. Cope, Carrie M. Cope, Grant Springer, Susan Springer, Luke Cope, Logan Cope, Scott Gatchel, Melissa Gatchel, Victor A. Yarosz, Amy Yarosz, Victor S. Yarosz, Nicolas J. Yarosz, J.C., by and through his father and next friend, Michael L. Cope, B.C., by and through his mother and next friend, Carrie M. Cope, and E.C., by and through her father and next friend, Luke Cope, and each of them, and the individual Class Members have been significantly exposed to vinyl chloride and other toxic substances at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that has been proven to cause cancer and other diseases in humans.

131. The hazardous materials carried by the train, including vinyl chloride, are highly toxic substances.

132. Plaintiffs and the Class Members were significantly exposed to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, due to

Defendants' tortious actions, including Defendant's negligent, ultra-hazardous, and willful and wanton conduct as alleged herein.

133. As a direct and proximate result of their exposure to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, Plaintiffs and the Class Members have a significantly increased risk of developing diseases and cancer, including liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's syndrome and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

134. This increased risk will warrant a reasonable physician to order monitoring.

135. Early diagnosis of these diseases and cancers has significant value for members of each Class because such diagnoses will help them monitor and minimize the harm therefrom.

136. Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different than that normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiffs' and the Class Members' exposures to the toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, released by the derailment, fire, and explosion.

137. Due to Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of the harmful and debilitating injuries resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

138. As a result, Plaintiff and each Class should be awarded the quantifiable costs of such a monitoring regime.

139. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the

imposition of punitive damages.

**Fifth Claim for Relief**
**(PRIVATE NUISANCE)**

140.     Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Thirty-nine (139), inclusive, above as if the same were fully rewritten herein.

141.     At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other combustible liquids, phosgene, and hydrogen chloride were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation and handling of these materials would cause injury to Plaintiffs and their property.

142.     Defendants, through their negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

143.     Defendants, through their negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other combustible liquids, phosgene, and hydrogen chloride onto Plaintiffs' land and have contaminated Plaintiffs' real property, water and persons.

144.     Defendants' contamination of Plaintiffs' real and personal property with vinyl chloride, butyl acrylate, benzene residue, and other toxic substances has unreasonably interfered with the rights of Plaintiffs to use and enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock. This has, in turn, caused significant loss of income,

out of pocket expenses, emotional distress and inconvenience.

145.    Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

146.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

147.    Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct, including the pollution of their land and water.

148.    Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

149.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**Sixth Claim for Relief**
**(PUBLIC NUISANCE)**

150.    Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Forty-nine (149), inclusive, above as if the same were fully rewritten herein.

151.    At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation and handling of these materials was hazardous and harmful to people living in nearby areas.

152.    Plaintiffs and the Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running water without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

153.    Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

154.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

155.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' and the Class Members' respective residences, thereby exposing them to toxic chemicals and carcinogens.

156.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated disease or illness, and

the present need for medical monitoring to ensure early detection of any such disease or illness.

157.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**Seventh Claim for Relief**
**(STATUTORY NUISANCE)**

158.    Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Fifty-seven (157), inclusive, above as if the same were fully rewritten herein.

159.    Pursuant to Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those sent by the Clean Air Act.

160.    Section 112 of the federal Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and set a national emission standard.  41 Fed. Reg. 46560 (1976).

161.    The Pennsylvania Air Pollution Control Act, 35 P.S. § 4013, also declares that any violation of its provisions "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement."

162.    Similarly, the Ohio Revised Code, R.C. 3704.03, states that "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

163.    As a direct and proximate result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride.

164.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiff and the Class Members have been exposed to hazardous air pollutants in violation of Pennsylvania, Ohio,

and federal law.

165.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids.

166.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

167.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**Eighth Claim for Relief**
**(TRESPASS)**

168.    Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Sixty-seven (167), inclusive, above as if the same were fully rewritten herein.

169.    At all times relevant hereto, Defendants knew or should have known vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission,

discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiff and their property.

170.    Defendants, through their activities alleged herein, allowed hazardous materials to enter and contaminate Plaintiffs' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

171.    Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' land and water.

172.    At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible liquids was contrary to Plaintiffs' rights in their property.

173.    At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their land.

174.    Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the matter of an ordinary, careful person or business.

175.    Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with hazardous materials has interfered with the rights of Plaintiffs to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

176. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs so choose.

177. Defendants' trespass has directly and proximately caused, and will continue to cause, Plaintiffs real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress.

178. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**Ninth Claim for Relief**
**(WILLFUL AND WANTON CONDUCT)**

179. Plaintiffs reallege and incorporate by reference the claims, allegations and statements set forth in Paragraphs One (1) through One Hundred Seventy-eight (178), inclusive, above as if the same were fully rewritten herein.

180. At all times relevant, Defendants owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and each Class.

181. Upon information and belief, Defendants, at all relevant times, were aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

182. Upon information and belief, Defendants, at all relevant times, were aware of the considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various

diseases and cancers in the surrounding population.

183.    Upon information and belief, Defendants, at all relevant times, were aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

184.    Upon information and belief, Defendants, at all relevant times, were aware that at least one railcar was malfunctioning for at least 20 miles before the derailment occurred.

185.    Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

a.    Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;

b.    Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

c.    Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

d.    Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

e.    Failing to prevent over-loading the train with too many railcars or materials;

f.    Failing to load the railcars consistent with accepted practice;

g.    Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.    Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

i.    Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and

dispatcher concerning the operation of the train on February 3, 2023;

j.      Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

k.      Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

l.      Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

m.      Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n.      Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o.      Failing to adequately warn those in danger of exposure to hazardous chemicals;

p.      Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

q.      Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r.      Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

s.      Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t.      Failing to timely implement such an emergency response plan;

u.      Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct.

v.      Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w.    Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x.    Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

z.    Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

aa.   Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons in order to avoid injury to;

bb.   Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids; and

cc.   Otherwise unreasonably causing injury to Plaintiff in ways further investigation and discovery will reveal.

186.   Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members.

187.   As a direct and proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride, throughout the Class Zone, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the

present need for medical monitoring to ensure early detection of any such disease or illness.

188.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

### REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs, Michael Bunts, Janet Bunts, Lillian R. Bunts, Michael L. Cope, Carrie M. Cope, Grant Springer, Susan Springer, Luke Cope, Logan Cope, Scott Gatchel, Melissa Gatchel, Victor A. Yarosz, Amy Yarosz, Victor S. Yarosz, Nicolas J. Yarosz, J.C., by and through his father and next friend, Michael L. Cope, B.C., by and through his mother and next friend, Carrie M. Cope, and E.C., by and through her father and next friend, Luke Cope, individually and collectively, and on behalf of all Class Members proposed in this Class Action Complaint, respectfully request that the Court enter judgment in their favor and against Defendants, Norfolk Southern Corporation and Norfolk Southern Railway Company, and against John Does 1-20 and ABC Corps. 1-20, and each of them, jointly and severally, as follows:

a.     For an Order certifying each Class, as defined herein, and appointing Plaintiffs and their Counsel to represent each Class;

b.     For damages, including compensatory, punitive and exemplary damages, in an amount determined just and reasonable;

c.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d.     For prejudgment interest on all amounts awarded;

e.     For injunctive and declaratory relief, as allowed by law; and

f.     Such other and further relief as this Court may deem just and proper.

Dated: March 20, 2023

/s/ *Eric H. Zagrans*

Eric H. Zagrans (0013108)
ZAGRANS LAW FIRM LLC
1640 Roundwyck Lane
Columbus, Ohio 43065-8416
(440) 452-7100 (telephone)
eric@zagrans.com (e-mail)

and

Steven M. Goldberg (0041344)
GOLDBERG LEGAL CO., LPA
31300 Solon Road, Suite 12
Solon, Ohio 44139
(440) 519-9900 (telephone)
steven@goldberglpa.com (e-mail)

*Attorneys for Plaintiffs and the Proposed Class*

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, on all issues so triable.

/s/ *Eric H. Zagrans*

Eric H. Zagrans